1

2

3

4

5

6

7                          IN THE UNITED STATES DISTRICT COURT

8                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   JUAN BONEFACIO ULIN,                           No. C-09-3160-EDL

11                  Plaintiff,                      **FINDINGS OF FACT AND
                                                    CONCLUSIONS OF LAW FOLLOWING
12         v.                                       COURT TRIAL; ORDER FOR
                                                    ADDITIONAL BRIEFING ON DAMAGES**
13   ALEA-72, INC. et al.,                          **CALCULATION**

14                  Defendants.                     Trial: December 12-13, 2010
     _____/
15

16   I.    **INTRODUCTION**

17         This is a wage and hour action brought by Plaintiff Juan Bonefacio Ulin (also known as

18   "Chapin") against his former employer ALEA-72 Inc. dba Lovell's Antique Gallery and its

19   owner/manager Abraham Magidish.  Plaintiff brought claims for violation of state and federal

20   overtime law, failure to provide meal periods under California law, failure to pay wages due and

21   "waiting time" penalties under California law, and violation of California Business & Professions

22   Code § 17200.[1]  This matter was tried to the Court from December 12, 2010 through December 13,

23   2010.  Adam Wang and Adam Peterson represented Plaintiff.  Shelley Buchanan represented

24   Defendants.  The parties consented to a court trial before a magistrate judge pursuant to 28 U.S.C. §

25   636(c).

26         At trial, Plaintiff contended that he worked for Defendants from July 16, 2005 to February

27   27, 2010, that he received a fixed daily salary, and that he regularly worked six days a week and

28   _____

           [1]  Plaintiff's complaint also contained a claim for violation of California Labor Code § 226 for
     failure to provide proper pay statements, and the Court previously granted judgment in Plaintiff's favor
     on this claim.

**United States District Court**
For the Northern District of California

1  twelve hours a day without receiving overtime pay.  Defendants argued that Plaintiff generally

2  worked four or five days a week for seven or eight hours a day and was paid extra if he worked

3  overtime.

4        On balance, the Court finds that Plaintiff worked some overtime hours for which he was not

5  adequately compensated, primarily when he was on out-of-state delivery trips, but that his testimony

6  revealed a pattern of exaggerations and inconsistencies (as set forth in more detail below) regarding

7  both the number of days per week and number of hours per day that he was required to work.

8  Accordingly, Plaintiff's testimony is not credible on many points.  Similarly, the video deposition

9  testimony of co-worker Eriberto Mendoza presented by Plaintiff was inconsistent, reflected an

10  unreliable memory with respect to dates, and contradicted Plaintiff's position regarding his lunch

11  breaks.

12        On the other hand, the Court also did not find Defendant Abraham Magadish or manager

13  Roberto Hernandez' testimony to be entirely credible.  Although Mr. Magadish, by his own

14  testimony and that of others, displayed a generally kind and generous nature, both he and Mr.

15  Hernandez exhibited some indifference to strict compliance with the letter of employment law.

16  According to Mr. Magadish, it was not a high priority to him as he focused on running the antique

17  business he started up as the sole owner and sought to make into a successful small business, and

18  later keep it going in the face of the recession.  Current employee Pedro Hernandez's testimony

19  contradicted the other deponents' testimony on many points, and is to be somewhat discounted in

20  light of his admitted fear that his testimony could impact his employment status. The Court found

21  Yessica Jiminez to be generally sincere and credible, although not accurate as to every single aspect

22  of her testimony.

23        Much of the sparse documentary evidence presented by both sides also cannot be taken at

24  face value, as there was conflicting and vague testimony as to how the documents were created.  For

25  example, the daily calendars produced by Mr. Magadish were demonstrably inaccurate, Mr.

26  Magadish admitted that he lacks good record-keeping skills, and there is some indication that the

27  calendars were not kept contemporaneously, as claimed by Mr. Magadish.  No witness could explain

28  exactly how the hours recorded on the calendars kept by Ms. Jiminez were obtained.  Plaintiff did

**United States District Court**
For the Northern District of California

1   not explain why he only produced 37 of the 87 pay envelopes he should have received during his

2   employment.

3       Against this backdrop, the Court makes the following findings of fact and conclusions of

4   law.

5   **II.    Findings of Fact[2]**

6       **A.    Background**

7       Alaea-72, Inc. dba Lovell's Antique Gallery, located at 625 Grant Street, San Francisco, has

8   been owned and managed by Defendant Abraham Magidish since 2002.  Lovell's is open to the

9   public from 9 a.m. to 9 p.m. Monday through Saturday and 10 a.m. to 6 p.m. on Sundays.  Joint Pre-

10  Trial Statement Undisputed Fact ("UF").   Lovell's had a gross income of $500,000 per year for the

11  years relevant to this lawsuit.  Id.  In 2004, Defendants opened a warehouse on Tennessee Street in

12  San Francisco for storage purposes.  The warehouse hours and days of operation differ from the

13  store hours.  From July 16, 2005 to February 27, 2009, Plaintiff was employed by Defendants as a

14  "stock boy," performing warehouse (packing and crating merchandise) and delivery services.  He

15  obtained the job after his cousin spoke to manager Roberto Hernandez and then Plaintiff spoke to

16  Mr. Hernandez, who recommended Plaintiff to Mr. Magidish.  When Plaintiff was laid off, Mr.

17  Magidish thoughtfully found Plaintiff another job at a higher rate of pay, so that Plaintiff never

18  experienced a period of unemployment.

19      **B.    Plaintiff's Salary**

20      Plaintiff received a fixed daily rate of pay of $65.00 in 2005, $70.00 in 2006, and $75.00

21  from 2007 until his layoff in February 2009.  This daily salary was intended to compensate for seven

22  or eight hours of work.  Def.'s Response to Interrogatory No. 5; Mag. Trial Testimony.  Plaintiff was

23  paid bi-monthly (generally on the 1st and 16th of each month), originally entirely in cash, but in

24  2008 partly by check.  Plaintiff received his cash pay in an envelope given to him by Roberto

25  Hernandez or an assistant, Yessica Jiminez.  The envelopes generally had written on them his name

26

27          [2]      Despite the fact that many relevant facts were not truly disputed, the parties did not file
    joint findings of fact and submitted only a few undisputed facts for the record.  The Court notes that its
28  conclusions of law may contain findings of fact and its findings of fact may contain conclusions of law.

United States District Court
For the Northern District of California

(or nickname) and a calculation of the number of days worked in the pay period multiplied by his daily salary, subtracting any amount paid by check. Trial Exs. 2, G. Ms. Jiminez usually told Mr. Magadish how many days in a pay period each employee had worked based on calendars she kept by writing the total on an envelope.

During Plaintiff's period of employment, he should have received 87 bi-weekly pay envelopes. Plaintiff produced 37 envelopes, none of which contain dates indicating what pay period the envelope included payment for. He did not explain at trial why all of the envelopes were not produced.[3] Nine of the envelopes give no indication of the number of days worked in the pay period, and contain only Plaintiff's name. Of the remaining 28 envelopes produced: five indicate 11 days worked in the pay period, three indicate 12 days worked in the pay period, six indicate 13 days worked in the pay period, nine indicate 14 days worked in the pay period, and five indicate 15 days worked in the pay period. Trial Exs. 2, G. Nine of the envelopes contain a written reduction of $350, which indicates that the envelope was from the period after March 31, 2008 when Plaintiff began receiving part of his payment by check.

Defendants argued at trial that Plaintiff only produced the envelopes most favorable to his position, and that his claim that these are all of the documents he has relating to his employment is not credible because he trained as an accountant in Guatemala and retained all cash remittance receipts for transmissions to Guatemala. Plaintiff did not dispute this contention or explain why all pay envelopes were not produced, other than to state that he did not receive an envelope with his pay approximately five times per year. Based on the lack of any explanation as to why the additional envelopes were not produced, the Court will not infer that the envelopes produced are reflective of the days Plaintiff worked during other pay periods.

Depending on the number of days in the month, the number of days worked in a pay period

---

[3] Defendants contend that Plaintiff only produced the envelopes most favorable to his position, and that his claim that these are all of the documents he has relating to his employment is not credible because he trained as an accountant in Guatemala and retained all cash remittance receipts for transmissions to Guatemala. Plaintiff did not dispute this contention or explain why all pay envelopes were not produced, other than to state that he did not receive an envelope with his pay approximately five times per year. Based on the lack of any explanation as to why the additional envelopes were not produced, the Court will not inference that the envelopes produced are reflective of the days Plaintiff worked during other pay periods.

United States District Court
For the Northern District of California

1  could be more than ten without overtime having been worked, but could never be more than 12

2  without some overtime. The number of days written on the envelopes was accurate and Plaintiff was

3  paid his daily salary for every day he worked.

4       Mr. Magadish testified that he made additional undocumented, irregular cash payments to

5  employees sometimes.  No employee complained that he was not being paid.  Other employees

6  testified that Mr. Magadish was generous.  Plaintiff and Mr. Mendoza dispute that they were ever

7  paid extra for overtime work.[4]

8     **C.**     **Plaintiff's Work Schedule**

9         **1.**      **Weekly Schedule While Working In Warehouse**

10       Plaintiff testified at trial that he worked six days a week from the time of his hire in July

11  2005 until approximately February or March 2008, when he began receiving two days a week off.

12  He testified that in 2009, he was scheduled for four days per week but occasionally worked an extra

13  day at Mr. Magadish's house.  Heriberto Mendoza also testified, through video deposition testimony

14  presented at trial, that he and other warehouse employees regularly worked six days a week.

15  However, Plaintiff and Mr. Mendoza's employment with Defendants overlapped for three months at

16  most, from July 2005 when Plaintiff started until September 2005 when Mr. Mendoza was

17  terminated.  Therefore, Mr. Mendoza's testimony only corroborates Plaintiff's testimony for those

18  few months.  Additionally, Mr. Mendoza's testimony with respect to dates and times worked

19  reflected confusion and a tendency to exaggerate and over-generalize(for example, he testified that

20  he *never* worked less than six days a week or less than 12 hours a day, in a manner reflecting

21  exaggeration).  Finally, Plaintiff and Mr. Mendoza are personal friends and relatives by marriage,

22  further undermining Mr. Mendoza's credibility as a neutral witness.  For all of these reasons, the

23  Court affords his testimony very little weight as it relates to how many days per week Plaintiff

24  worked.

---

26       [4]  Warehouse employees sometimes received tips from customers for deliveries that they assisted
with .  Both sides presented evidence at trial about the fact that Plaintiff received tips from customers
27  while making deliveries. Following trial, the Court asked for additional briefing from the parties about
the impact of customer tips on Plaintiff's claims.  The parties submitted additional briefing in which
they agree that the "tip wage credit" does not apply in this case.  See Def.'s Supp. Trial Brief at 2-3;
28  Pl.'s Summation Following Bench Trial at 6-8.  Thus,  the fact that Plaintiff received tips from
customers is ultimately irrelevant to the Court's analysis.

United States District Court
For the Northern District of California

In contrast, Defendants presented credible testimony, including about the workload at the warehouse, that warehouse employees were regularly scheduled for five days a week until approximately 2008. During this time, Plaintiff's regular schedule could differ if Plaintiff switched workdays with another employee, in which case he might have worked more than five days per week on occasion. However, Plaintiff presented no evidence indicating that he ever switched schedules with other employees resulting in additional days having been worked. In approximately 2008, warehouse employees' schedules were reduced to four days a week because the economy slowed down and there was not enough work for them to do. Trial Exs. B, C. Roberto Hernandez testified that workdays were reduced for all employees, and that Plaintiff requested more work days but was told that more days were not available. On occasion, Mr. Magadish paid employees to work at his house so that he did not have to lay them off.

The Court credits the consistent testimony of Defendants' witnesses that Plaintiff usually worked in the warehouse five or less days a week, over Plaintiff's testimony that he was required to work six days a week on a regular basis. Plaintiff has provided no evidence, other than his own self-serving testimony, that he worked more than five days a week in the warehouse.

### 2.   Daily Schedule

Plaintiff, along with other warehouse employees, was required to report for work at Lovell's store at 9 a.m. From 9 a.m. to approximately 10 a.m., Plaintiff and the other warehouse employees ate breakfast and drank coffee and (although the defense presented some unpersuasive testimony to the contrary) performed some cleaning and other work (such as moving heavy statutes) at the store while Roberto Hernandez organized the tasks for the day. On one occasion, Plaintiff was photographed talking on his phone during this time period. Trial Ex. H. At approximately 10 a.m. or 10:30 a.m., the warehouse employees usually were driven or took a bus to the warehouse where they performed packing, crating and shipping duties. In the afternoons, the warehouse employees packed items until a shipping company came to pick the items up.

Plaintiff testified that after the afternoon shipping pickup, he typically continued to pack orders in the warehouse until 8:00 or 8:30 p.m., and then returned to the store until 9:00 p.m. (except Sundays when the store closed at 7:00 p.m.). However, Roberto Hernandez testified that he did not

United States District Court
For the Northern District of California

1    trust Plaintiff working in the store because he was concerned that he might break something.

2    Plaintiff testified that he left the warehouse directly for home in the evening, as opposed to going to

3    the store first, only approximately five times per year.  Heriberto Mendoza also testified that his

4    schedule was 9:00 a.m. to 9:00 p.m. except on Sundays when he worked 10:00 a.m. to 7:00 p.m.

5    However, for the reasons discussed above, Mr. Mendoza's testimony is generally unreliable and

6    does little to advance Plaintiff's case.

7            On the other hand, Defendants put forward persuasive evidence that there was not enough

8    work to necessitate warehouse employees working after 6:00 p.m. on a regular basis.  Mr. Magadish

9    testified that employees were never required to return to the store in the evening after working in the

10   warehouse.  It was important to Defendants that the warehouse employees have sufficient time and

11   energy to carefully pack the merchandise for shipping because it was not cost-effective to have

12   pieces broken during shipping.  Therefore, Defendants maintained a sufficient number of warehouse

13   employees so that they would not be overworked, and tried to make their work as stress-free as

14   possible.  Mr. Magadish kept employees employed when there was not enough work to be done

15   because had personal qualms about firing people without finding them another job.  When business

16   was slow, Mr. Magadish sometimes did not pay himself in order to keep on employees, and took out

17   loans to keep the business afloat.  Roberto Hernandez testified that warehouse manager Martin Perez

18   generally called Roberto Hernandez to inform him that the warehouse workers were done for the day

19   at 6 p.m.  Warehouse employee Pedro Hernandez also testified that work generally ended at 6:00

20   p.m.  Additionally, according to Heriberto Mendoza, a warehouse employee could not attend school

21   if he worked from 9:00 a.m. to 9:00 p.m., as claimed by Plaintiff.  It is undisputed that Plaintiff

22   worked other jobs and attended English classes on Saturdays during some of the time that he was

23   employed by Defendants.  Weighing the evidence presented, the Court finds that Plaintiff (and other

24   warehouse employees) were generally required to be at work from 9:00 a.m. until 6:00 p.m., and did

25   not typically work until 9:00 p.m. as claimed by Plaintiff.

26           In some limited instances, however, customers requested that a Bay Area delivery be

27   scheduled after 6 p.m.  Trial Ex. 3-A.  Specifically, six out of 225 shipping invoices produced show

28   deliveries scheduled for after 6:00 p.m., though one was cancelled.  Id.  In those cases, warehouse

7

1    employees involved in that delivery worked after 6:00 p.m.  This was not typical because customers

2    generally did not request late deliveries and because it was better to make deliveries during daylight

3    hours and earlier in the day when employees were not tired.  Also, there was defense testimony that

4    many customers would prefer to welcome strangers such as delivery people into their homes during

5    daylight.  Plaintiff has no recollection of whether he was involved in any of the deliveries after 6:00

6    p.m. reflected in Trial Exhibit 3-A, and there is no other evidence of any other deliveries made after

7    6:00 p.m.  Plaintiff recalls that on at least one occasion he assisted in deliveries after 6:00 p.m. in

8    Millbrae and San Jose, California and returned to warehouse at approximately 11:00 p.m.

9        Additionally, on one occasion, Plaintiff was asked to help Mr. Magadish with electrical work

10   on his day off, and he was promised that he would be paid extra but was not.  On another occasion,

11   Plaintiff assisted in putting in new flooring at the store.  Plaintiff testified that during the three days

12   of this job, he worked around the clock – in the warehouse by day and in the store doing flooring by

13   night.  Mr. Magadish testified that the flooring job was done during the day over the Jewish

14   holidays, when the store was closed, and Plaintiff was paid for all days worked during this period.

15   The Court credits Mr. Magadish's testimony over that of Plaintiff because it makes good business

16   sense to perform a flooring job which necessitates the store being closed during a holiday period

17   when the store is closed anyway.

18                          **3.      Meal Periods**

19       No records relating to lunch breaks were kept.  Roberto Hernandez told the employees they

20   could take a one hour lunch break and he believed they did so from approximately 2 p.m. to 3 p.m.

21   He did not know how often the lunch hour was interrupted by deliveries to the warehouse, but

22   believes that deliveries generally arrived at the warehouse at 10:30 or 11:00 a.m. and pick-ups were

23   made between 3:00 and 5:00 p.m.  However, Mr. Hernandez did not regularly work in the

24   warehouse.  According to Plaintiff, he had a lunch break every day, but his lunch break was

25   interrupted approximately twice a week and also there was too much packing for a 30 minute lunch

26   three to four days per week.  The Court does not find Plaintiff's testimony that there was too much

27   work in the warehouse to make time for lunch so frequently to be credible, in light of Mr.

28   Magadish's testimony that it made good business sense to ensure that the warehouse workers had

1   time to carefully pack the valuable goods and the unrebutted testimony of Roberto Hernandez

2   concerning the average number of items that warehouse workers packed and shipped on a daily

3   basis.  Further, co-workers Heriberto Mendoza and Pedro Hernandez testified that they generally

4   had one hour to eat lunch, although Mr. Mendoza testified that his lunch was interrupted once or

5   twice a week when delivery trucks arrived at that time but he was free to go back to eating once the

6   delivery was unloaded.  Based on this testimony, the Court finds that approximately twice a week

7   Plaintiff was required to work during at least a portion of his lunch break.

8          The warehouse manager, Martin Perez, generally went out and brought lunch back to the

9   warehouse for the group to eat.  Mr. Magadish and Roberto Hernandez testified that they never told

10  warehouse employees that they were required to stay on premises during lunch.  However, the

11  warehouse was in a relatively deserted area and employees did not believe that they were permitted

12  to leave the warehouse premises during their lunch breaks.  Specifically, Plaintiff testified that he

13  did not believe he was allowed to leave during lunch for personal reasons unless it was very

14  important, in which case he could ask permission.  Mr. Mendoza also did not believe he could leave

15  during lunch because the warehouse was in a remote location.  Defense witness Mr. Pedro

16  Hernandez appeared to be confused by questioning regarding whether he was required to stay on

17  premises, testifying that he was not required to stay at the warehouse during his lunch hour but that

18  Roberto Hernandez (on at least one occasion) told him it was forbidden to run personal errands

19  during lunch.  On balance, and weighing the conflicting testimony on this issue, it appears to the

20  Court that it was not Defendants' official policy to prohibit employees from leaving the premises

21  during lunch and no one directed, commanded or restrained Plaintiff from leaving.  Instead,

22  Plaintiff's inability to leave the premises during lunch was more likely a result of the fact that the

23  warehouse was in a relatively remote part of San Francisco and Plaintiff had no mode of

24  transportation.

25              **4.       Out-of-State Delivery Trips**

26          In addition to his work at the warehouse, Plaintiff also accompanied a driver on out-of-state

27  delivery trips from approximately 2006 to 2009.  Trial Ex. I.  In April 2008, Plaintiff went on a

28  delivery trip to Southern California, Texas, and Colorado.  Ex. I.  In October 2008, Plaintiff went on

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

a delivery trip to Utah, Colorado, Missouri, Kansas, North Carolina, Louisiana and Florida.  Id.  In November 2008, Plaintiff went on a delivery trip to Virginia and Florida, as well as a trip to Missouri, Kentucky and Georgia.  Id.  Plaintiff's regular schedule differed when he went on out-of-state delivery trips, and he sometimes worked more than five days per week during these trips.  These trips sometimes spanned two pay-periods and were up to 20 days long.  Plaintiff was paid his regular salary for every day he was on a trip, whether or not he had free time during the trip.  All of Plaintiff's expenses were paid while he was on delivery trips.  Roberto Hernandez told the driver not to drive more than eight hours per day, but did not know if the driver complied.

**D.   Record keeping**

Defendants did not maintain a timeclock or time cards to keep track of employee hours.  Ms. Jiminez arrived at the store at 10 a.m. five days a week and recorded which employees were present on a calendar, as well as their days off on a daily or weekly basis.  Beginning in approximately 2007 or 2008, Ms. Jiminez began recording the hours worked by each employee to determine if their days or hours should be reduced.  It was her job to keep track of hours.  However, she did not go to the warehouse so she had no direct personal knowledge of the hours worked there.  Mr. Roberto Hernandez sometimes, but not always, reported the hours worked by the warehouse employees to Yessica Jiminez but he also did not regularly work in the warehouse.  Mr. Roberto Hernandez did not consider it his job to monitor warehouse employees' hours.  Ms. Jiminez's calendars for 2005 through 2007 have been lost, and her calendars for April through September 2008 were produced.  Trial Ex. B.

Mr. Magadish kept calendars at his home of the days worked by his employees.  Trial Ex. B.  These calendars are admittedly unreliable and not based on personal observation of when employees were working.  Additionally, Mr. Magadish's calendars do not match up with Trial Exhibit I (the delivery log) or Ms. Jiminez's calendars, contain no instances of Plaintiff having worked six days a week even though this occurred in some instances when Plaintiff made out-of-state deliveries, and show Plaintiff working from April through June 2005 when it is undisputed that he did not start work until July 2005.

**E.   Mr. Magadish's Involvement In Plaintiff's Employment**

1        Mr. Magidish was responsible for posting, calculating, measuring, estimating, recording, or

2   otherwise determining the hours worked by Plaintiff, and wages paid him.  Trial Ex. 6, 7.  Mr.

3   Magidish also authorized and issued payments to Plaintiff.  Id.  Mr. Magidish supervised Plaintiff's

4   work, and was responsible for recruiting, hiring, firing, disciplining, assigning jobs and setting

5   wages for Plaintiff.  Id.  Mr. Magadish was aware, prior to opening Lovell's in 2002, that he would

6   have to pay extra as overtime if an employee worked over eight hours in a day and that it would be

7   contrary to law not to do so.

8          **F.**     **Plaintiff's Work Authorization Status**

9        When Plaintiff was hired in July 2005, Defendants did not ask him for any work

10  authorization documents.   In March 2008, Plaintiff submitted false work authorization documents to

11  his employer when he signed a Form I-9, his Employment Eligibility Verification form.  Plaintiff

12  believed that Ms. Jiminez and Mr. Roberto Hernandez knew the documents were false, and neither

13  individual testified to the contrary.

14         **G.**     **Defendants' Knowledge of Plaintiff's Immigration Status**

15       At the time he was hired, Plaintiff initially spoke to Roberto Hernandez to obtain his job at

16  Lovell's.  Defendants provided Mr. Hernandez with no training regarding review of potential

17  candidates and he was not instructed to ask potential employees for employment eligibility

18  documents as part of the hiring process.  Mr. Magadish did not ask Mr. Hernandez if he asked new

19  hires for employment eligibility documentation, did not personally ask for such documentation, and

20  did not consider it to be a high priority to verify any employee's immigration status.  Mr. Magadish

21  believed that Guatemalans benefitted from an "amnesty" program that allowed them to work in the

22  United States, but did not take any steps to verify that this was true as to Plaintiff.  Mr. Hernandez

23  did not ask any employees, including Plaintiff, for work authorization documents at the time they

24  were hired.

25       In 2006, following immigration raids at similar businesses in San Francisco, Roberto

26  Hernandez spoke to Plaintiff and other warehouse employees about obtaining work authorization

27  documents so that they could be paid by check.  Plaintiff testified that Mr. Hernandez took them to

28  the Mission District of San Francisco, where Plaintiff spoke to a man who obtained documents for

1   him.  Mr. Hernandez initially testified that he was not aware of Plaintiff's immigration status at the

2   time of hire and that he was not concerned about the immigration raids.  However, Defendants did

3   not question Mr. Hernandez about his role in assisting Plaintiff obtain immigration documents after

4   the raids, despite the opportunity to do so when they re-called Mr. Hernandez.

5          In approximately 2006 or 2007, Mr. Magadish asked Yessica Jiminez, to prepare the

6   appropriate paperwork for employees so that he could "organize his business" in response to

7   learning about a workers' compensation lawsuit at another business.  He was aware of immigration

8   raids on similar businesses in 2006, but denied that the raids were the primary motivating factor for

9   requesting that paperwork be filled out.  He did not direct Ms. Jiminez to any particular forms

10  because he believed she knew more about the forms than he did.  Mr. Magadish did not follow up

11  with Ms. Jiminez regarding the paperwork because it was not a priority for him, and it took her

12  approximately two years to complete the paperwork.  Defendants began keeping payroll forms for

13  Plaintiff on March 31, 2008.  Trial Exh. 1.  Mr. Magadish testified that had he known that Plaintiff

14  submitted false documentation in 2008, he would have fired Plaintiff.

15         There was conflicting trial testimony about whether the warehouse employees were "hidden"

16  in the warehouse during the immigration raids on similar businesses in 2006.  Mr. Hernandez

17  claimed that he was unaware of the raids until he got home that day and was not nervous about them.

18  Plaintiff claims that Mr. Hernandez knew that the employees were undocumented and brought them

19  from the store to the warehouse to "hide" during the raids.  Given that shortly after the raids Mr.

20  Hernandez instructed Plaintiff and others on how to obtain employment authorization documents

21  and assisted them in obtaining documents, the Court finds Plaintiff's testimony on this point to be

22  more credible.

23  **III.   Conclusions of Law**

24          **A.      Immigration Issues**

25                  **1.      Impact of Immigration Violations on Plaintiff's Claims**

26          The impact of Plaintiff's admitted violation of IRCA (submission of false employment

27  documents to his employer in March 2008) on his claims is disputed.  While a close legal question,

28  the Court held that this violation did not warrant summary judgment of Plaintiff's claims in

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Defendants' favor prior to trial.  See Order Granting in Part and Denying In Part Motion For

2   Summary Judgment at 9-13.  The Court noted that resolution of this issue would ultimately turn on

3   whether Defendants were actually deceived by Plaintiff, and/or whether they were complicit in

4   hiring or retaining Plaintiff as a falsely documented employee.  See Order For Additional Briefing

5   On False Documents Issue.  The parties were invited to present evidence on the factual

6   circumstances surrounding when and why Plaintiff presented false documents to Defendants,

7   including whether Defendants were actually deceived by Plaintiff or were complicit in his

8   immigration violation, at trial.  See Order Following Pre-Trial Conference.  The parties and the

9   Court agreed that Defendants have the burden of proving deception.  Id.  Having heard the evidence

10  as described above, the Court finds that Plaintiff's admitted presentation of false documents does

11  not, under the unique circumstances of this case, legally bar his claims because Defendants were not

12  actually deceived.

13          Defendants did not meet their burden of proving that they were actually deceived by

14  Plaintiff, and instead Plaintiff showed that Defendants were more likely active participants in his

15  IRCA violation as well as violators of IRCA in their own right.  Specifically, Defendants did not ask

16  Plaintiff for any immigration or employment verification documents at the time of his hire or until

17  approximately three years later, in violation of IRCA.  Defendants did not train the manager who

18  made hiring decisions on immigration issues, did not ask him to inquire about the immigration status

19  of new hires, and did not directly inquire as to new hire's status, because it was a low priority.

20  Plaintiff testified that after immigration raids on similar businesses in the area, manager Roberto

21  Hernandez assisted Plaintiff and others in obtaining false work authorization documents.  Though

22  Defendants had the opportunity to refute Plaintiff's testimony when Roberto Hernandez returned to

23  the stand, they did not do so.

24          This case presents a stronger reason not to reward an employer by denying overtime pay than

25  the case relied on by Plaintiff, Jara v. Strong Steel Doors, Inc., 2007 WL 2696110, *5 (N.Y.Sup.

26  2007), because here, Defendants knowingly violated IRCA.  In Jara, after the case was filed it was

27  discovered that the employee seeking overtime pay under New York state law had presented false

28  immigration documents to his employer.  The defendants in Jara moved for partial summary

13

judgment based on the plaintiff's presentation of false documents in violation of IRCA, citing Hoffman v. Plastic Components, Inc. v. National Labor Relations Board, 535 U.S. 137, 149, 151 (2002), which held that a worker who submitted false documents to his employer could not obtain a backpay award under the National Labor Relations Act because an award of backpay "for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by criminal fraud" would run counter to immigration policy. The Jara court distinguished Hoffman, and held that requiring defendants to pay prevailing wages and overtime to plaintiff for work actually performed, unlike an award of backpay for work not done, despite the plaintiff's presentation of false documents, would further the goals of IRCA by removing the incentive to hire illegal aliens (noting that the purpose of IRCA is not to prevent aliens from being compensated for work already performed). Id. at *6. The court noted that no court has held that an undocumented worker may be deprived of wages for work already performed. Id. at *7. The court also noted that the presentation of false documents was not a contributing cause of the failure to pay prevailing wages, because there the false document issue was not even discovered until after termination. Id. The same is true in this case, and the fact that Defendants admittedly did not even purport to check Plaintiff's documents until after almost three years of employment (also in violation of IRCA) strengthens this conclusion.

### 2.      § 17200 Statute of Limitations

Prior to trial, Defendants asked the Court to Order that Plaintiff's violation of the Immigration Reform and Control Act ("IRCA") (presenting false documents) precludes his claim for restitution dating back four years under California Business & Professions Code § 17200. See Motion in Limine No. 2. They sought an Order that the applicable statute of limitations for California Labor Code violations is three years, and Plaintiff is not entitled to any damages from July 16, 2005 to July 16, 2006 under the UCL. The Court denied the motion in limine as premature, and now denies it in its entirety.

In Cortez v. Purcolator Air Filtration Products Co., 23 Cal. 4th 163, 179-81 (2003), the California Supreme Court held that, "in addition to those defenses which might be asserted to a charge of violation of the statute that underlies a UCL action, a UCL defendant may assert equitable

14

United States District Court
For the Northern District of California

considerations. In deciding whether to grant the remedy or remedies sought by a UCL plaintiff, the court must permit the defendant to offer such considerations. In short, consideration of the equities between the parties is necessary to ensure an equitable result." However, "equitable defenses may not be asserted to wholly defeat a UCL claim since such claims arise out of unlawful conduct." Id. In so holding, the Court noted that the "UCL imposes strict liability when property or monetary losses are occasioned by conduct that constitutes an unfair business practice" and therefore it could not "foresee how any equitable consideration could defeat a claim for unpaid wages." Id. However, the Court held that it could not "foreclose the possibility that defendant has evidence that the trial court might consider relevant when, on remand, it fashions a remedy for plaintiff's unfair business practice." Id.

Plaintiff submitted false documents to his employer which would, in most cases, likely weigh in favor of limiting his equitable remedies. However, Defendants did not ask Plaintiff for the required documentation at the time of his hire in July 2005, and did not obtain the required paperwork from him until March 2008. Thus, Defendants were also in violation of IRCA by failing to ensure that Plaintiff was appropriately documented, and/or were willfully blind to Plaintiff's legal status, for almost three years of his employment. See 8 U.S.C. § 1324a(b). Further, a manager of Defendants assisted Plaintiff in obtaining the false documents, and there uis contradicted testimony that Ms. Jiminez, the individual who reviewed Plaintiff's documents and filled out the I-9 Form for Plaintiff, knew the documents were false. Therefore Defendants were not "fooled" by Plaintiff's submission of false documents. See Coque v. Wildflower Estates Developers, Inc., 867 N.Y.S.2d 158, 165 (2008) (employee who submitted false social security card to employer not precluded from obtaining lost wages for a job-related injury where employer did not examine appropriate documents to determine eligibility at the time of hire because "If the employer hires the employee with knowledge of the employee's undocumented status, or without verifying the employee's eligibility for employment, the employer has not been induced by the false document to hire the employee and, thus, the employee has not 'obtained employment by' submitting the false document."). Therefore, here equitable considerations do not weigh in favor of limiting Plaintiff's remedy for the period from July 16, 2005 to July 16, 2006, since both parties were in violation of IRCA during this period.

United States District Court
For the Northern District of California

1  Plaintiff is entitled to restitution for any proven violations of the California Labor Code going back

2  four years pursuant to § 17200.

3

4       **B.**     **Individual Liability of Mr. Magadish for FLSA Claims**

5       The FLSA defines an "employer" as "any person acting directly or indirectly in the interest

6  of an employer in relation to an employee . . . ."  29 U.S.C. § 203(d).  The definition of "employer"

7  under the FLSA is not limited by the common law concept of "employer," but "'is to be given an

8  expansive interpretation in order to effectuate the FLSA's broad remedial purposes.'"  Boucher v.

9  Shaw, 572 F.3d 1087, 1090 -1091 (9th Cir. 2009) (quoting Lambert v. Ackerley, 180 F.3d 997,

10 1011-12 (9th Cir.1999) (en banc).  The determination of whether an employer-employee relationship

11 exists does not depend on "isolated factors but rather upon the circumstances of the whole activity."

12 Id.  The key is the "economic reality" of the relationship.  Id.

13      The economic reality test requires the court to examine whether the alleged employer:  (1)

14 had the power to hire and fire the employee; (2) supervised and controlled employee work schedules

15 or conditions of employment; (3) determined the rate and method of payment; and (4) maintained

16 employment records.  See Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1470

17 (9th Cir.1983) (abrogated on other grounds by Garcia v. San Antonio Metropolitan Transit

18 Authority, 469 U.S. 528, 539 (1985)); see also Lambert, 180 F.3d at 1012 (CEO and COO properly

19 deemed employers under the FLSA where they had a significant ownership interest as well as

20 operational control of significant aspects of the company's day-to-day functions, the power to hire

21 and fire employees, the power to determine salaries, and responsibility for maintaining employment

22 records);  Chao v. Hotel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007) (corporation's president

23 personally liable where he had ultimate control over business' day-to-day operations and was the

24 corporate officer principally in charge of directing employment practices); United States Dep't of

25 Labor v. Cole Enters., Inc., 62 F.3d 775, 778-79 (6th Cir. 1995) (president and 50% owner of

26 corporation was "employer" within FLSA where he ran business, issued checks, maintained records,

27 determined employment practices and was involved in scheduling hours, payroll and hiring

28 employees).

16

1   Mr. Magidish was responsible for posting, calculating, measuring, estimating, recording, or

2   otherwise determining the hours worked by Plaintiff, and wages paid him.  Trial Ex. 6, 7.  Mr.

3   Magidish also authorized and issued payments to Plaintiff, supervised Plaintiff's work, and was

4   responsible for recruiting, hiring, firing, disciplining, assigning jobs and setting wages for Plaintiff.

5   Id.  Therefore, Mr. Magadish was Plaintiff's employer and is personally liable for Plaintiff's

6   damages under the FLSA.

7   **C.   Substantive Claims**

8   **1.   Failure to Pay Overtime Under California Labor Code § 510 and FLSA**

9   **a.   Burden-Shifting Standard for Both Claims**

10   An employee bringing an overtime claim under the Fair Labor Standards Act ("FLSA") has

11   the burden of proving that he performed work for which he was not properly compensated.

12   Anderson v. Mt. Clemens Pottery, 328 U.S. 680, 687-88 (1946).  In view of the remedial purpose of

13   the FLSA and the employer's statutory obligation to keep proper records of wages, hours and other

14   conditions and practices of employment, this burden is not to be "an impossible hurdle for the

15   employee."  Id.  "[W]here the employer's records are inaccurate or inadequate and the employee

16   cannot offer convincing substitutes, . . .  the solution . . . is not to penalize the employee by denying

17   him any recovery on the ground that he is unable to prove the precise extent of uncompensated

18   work.  Such a result would place a premium on an employer's failure to keep proper records . . .; it

19   would allow the employer to keep the benefits of an employee's labors without paying due

20   compensation as contemplated by the [FLSA]."  Brock v. Seto, 790 F.2d 1446, 1448 (9th Cir. 1986)

21   (quoting Anderson, 328 U.S. at 688).

22   "[A]n employee has carried out his burden if he proves that he has in fact performed work

23   for which he was improperly compensated and if he produces sufficient evidence to show the

24   amount and extent of that work *as a matter of a just and reasonable inference.*"  Id. (emphasis in

25   original).  The burden then shifts to the employer to show the precise number of hours worked or to

26   present evidence sufficient to negate "the reasonableness of the inference to be drawn from the

27   employee's evidence."  Id.  If the employer fails to make such a showing, the court "may then award

28   damages to the employee, *even though the result be only approximate.*"  Id. (emphasis in original).

1    "[A]n award of back wages will not be barred for imprecision where it arises from the employer's

2    failure to keep records as required by the FLSA." Id.; see also Hernandez v. Mendoza, 199 Cal.

3    App. 3d 721 (1988) (quoting and applying standard set forth in Brock in connection with California

4    Labor Code claim).

5         Plaintiff has established that he performed some work for which he was not properly

6    compensated and presented sufficient evidence to show the amount and extent of that work as a

7    matter of a just and reasonable inference.  While Plaintiff did not prove that he routinely worked six

8    days a week or twelve hours a day in the warehouse as he claims or that he was forbidden from

9    leaving the premises during his lunch hour, he did establish that he was required to be at work from

10   9:00 a.m. until 6:00 p.m. and that he was not relieved of all duties during his meal period

11   approximately twice a week.  Thus, he worked approximately two hours for which he was not

12   properly compensated each week that he worked in the warehouse.  Additionally, on one occasion

13   he worked until 11:00 p.m. making a late delivery.

14        Further, Plaintiff established that he worked more than five days a week while making

15   lengthy out-of-state delivery trips.  In addition to witness testimony on this point, Plaintiff's pay

16   envelopes show that plaintiff worked eleven days in a pay period five times, twelve days in a pay

17   period three times, thirteen days in a pay period six times, fourteen days in a pay period nine times,

18   and fifteen days in a pay period five times.  Trial Exs. 2, G.  From this evidence, it is just and

19   reasonable to infer that in each of the pay periods where Plaintiff worked more than 10 days, he

20   worked more than five days per week.  Thus, based on the pay envelopes produced, Plaintiff worked

21   90 days for which he should have been paid overtime but was not. Finally, Plaintiff  performed

22   electrical work for Mr. Magadish during his day off on one day.

23        Defendants have not met their burden of showing the precise number of hours worked and

24   have not presented evidence sufficient to negate the reasonableness of the inference to be drawn

25   from Plaintiff's evidence.  Defendants kept no records of Plaintiff's work hours until April 2008, and

26   never kept records relating to lunch breaks.  Ms. Jiminez's calendar in which she recorded the hours

27   worked by Plaintiff and other employees beginning in April 2008 is inherently unreliable because

28   she did not work at the warehouse, worked only five days a week that did not necessarily coincide

United States District Court
For the Northern District of California

18

United States District Court
For the Northern District of California

with the days worked by Plaintiff, arrived at 10:00 a.m., and could not clearly testify about how she obtained knowledge of what hours the employees worked.  With respect to the number of days per week worked, the testimony at trial was consistent that Plaintiff worked more than five days a week when he was on out-of-state deliveries.  The Court gives no weight to Mr. Magadish's calendar, which reflects that Plaintiff consistently worked five or less days per week, because it contradicts both Ms. Jiminez's calendar and the record of out-of-state delivery trips, was not made based on personal knowledge, and is demonstrably inaccurate.  The Court finds that the pay envelopes submitted by Plaintiff, which show that on several occasions Plaintiff worked more than ten days in a pay period, are more reliable than the calendar kept by Ms. Jiminez or Mr. Magadish.

Thus, damages for failure to pay overtime are warranted.  Because very few records were kept, these damages must necessarily be approximated.  The Court finds that Plaintiff is entitled to two hours of overtime pay for each week that he worked in the warehouse within the applicable limitations period, five hours of overtime pay for one late delivery, as well as 91 additional days of overtime pay based on the extra days reflected on the pay envelopes produced.

### b.    California Labor Code § 510

California Labor Code § 510 provides that: "Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee."

California Business and Professions Code section 17200 prohibits three types of wrongful business practices: any (1) unlawful, (2) unfair, or (3) fraudulent business practice or act.  See People ex rel. Bill Lockyer v. Fremont Life Ins. Co., 104 Cal. App. 4th 508, 515 (2002). "With respect to the unlawful prong, [v]irtually any state, federal or local law can serve as the predicate for an action under section 17200." Id. (internal citation and quotation marks omitted). "'[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice 'borrows' violations of other laws and treats these violations, when committed pursuant to a business activity, as unlawful practices independently actionable under section 17200 et seq. and

**United States District Court**
For the Northern District of California

1    subject to the distinct remedies provided thereunder.'" Id.

2         Any person harmed by such unfair practice is entitled to restitution. Cal. Bus. & Prof. Code

3    §17203.  Restitution under §17203 is a distinct remedy, cumulative to remedies under any other

4    laws.  Business & Professions Code §17205; see also Cortez v. Purcolator Air Filtration Products

5    Company, 23 Cal.4th 163 (2000).  Generally, the statute of limitations for section 17200 claims is

6    four years.  See Business & Professions Code § 17208 ("Any action to enforce any cause of action

7    pursuant to this chapter shall be commenced within four years after the cause of action accrued.")

8                              **i.      Statute of Limitations**

9         As discussed above, the statute of limitations for Defendants' violations of the California

10   Labor Code brought under § 17200 is four years, so Plaintiff is entitled to restitution dating back to

11   as early as July 13, 2005.

12                             **ii.      Damages**

13        For purposes of calculating unpaid overtime wages under the California Labor Code,

14   Plaintiff's rate of pay shall be calculated by multiplying his daily rate of pay by the number of days

15   he worked during the workweek and dividing by 40.  See Espinoza v. Classic Pizza, Inc., 114

16   Cal.App.4th 968, 973 (2003) (under wage order mandating overtime pay for a workweek exceeding

17   40 hours or a workday exceeding eight hours, "the method for computing the 'regular rate of pay'

18   for an employee who receives a fixed weekly salary for a fluctuating workweek is to divide that

19   salary by no more than 40 hours").  The California Labor Code does not allow for liquidated

20   damages for failure to pay overtime.  See Cal. Labor Code § 1194.2(a) ("Nothing in this subdivision

21   shall be construed to authorize the recovery of liquidated damages for failure to pay overtime

22   compensation.").

23                            **c.      Fair Labor Standards Act**

24                            **i.      Statute of Limitations**

25        The statute of limitations for overtime claims under the FLSA is two years, or three years for

26   willful violations.  See 29 U.S.C. § 255(a).  Pursuant to McLaughlin v. Richland Shoe Co., 486 U.S.

27   128, 130-131 (1988), an employer has not committed a willful violation unless "it knew or showed

28   reckless disregard for the matter of whether its conduct was prohibited by the FLSA."  "If an

employer acts reasonably in determining its legal obligation, its action cannot be deemed willful . . . . If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then" it would not be deemed willful.  Id.

Mr. Magadish admitted during trial that he was aware, prior to opening Lovell's in 2002, that he would have to pay extra as overtime if an employee worked over eight hours in a day and that it would be contrary to law not to do so.  However, he also testified that he believed that the daily salary he paid compensated employees for eight hours of work, and there is no evidence that he was aware that Plaintiff was working in excess of eight hours a day.  Other employees testified to Mr. Magadish's generosity and fairness.  Indeed, he did not lay Plaintiff off due to the slowdown in work until he found Plaintiff another job at a higher rate of pay.  Plaintiff did not complain about Defendants' failure to pay overtime while he was employed at Lovell's or otherwise bring his claims to Defendants' attention.  On balance, while a close question, the Court concludes that Defendants' violations of the FLSA were not willful, so a two year statute of limitations applies.

### ii.    Damages

Under the FLSA, the proper method of calculating Plaintiff's regular rate of pay is to multiply his daily rate of pay by the number of days he worked during the workweek and divide by the total hours he actually worked.  He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek.

The FLSA also provides for liquidated damages in an amount equal to the unpaid wages.  29 U.S.C. § 216(b).  However, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof . . ."  29 U.S.C. § 260.  "Under 29 U.S.C. § 260, the employer has the burden of establishing subjective and objective good faith in its violation of the FLSA."  Local 246 Utility Workers Union of America v. Southern California Edison Co., 83 F.3d 292, 297 -298 (9th Cir. 1996).  Thus, Defendants' burden is to establish that they had "an honest intention to ascertain and follow the dictates of the Act" and had "reasonable grounds for believing that [their] conduct complie[d] with

United States District Court
For the Northern District of California

the Act." Id.  "If the employer fails to carry that burden, liquidated damages are mandatory."  Id.  If the employer succeeds in carrying the burden, the court may still award liquidated damages in its discretion.  Id. at 298.

Here, Defendants have met their burden.  Mr. Magadish appeared sincerely concerned with the well-being of his employees and endeavored to treat them fairly.  It appears to the Court that he was at least generally aware of the overtime requirements of the FLSA and believed that he was in compliance with those requirements.  Further, his conduct was reasonable in that no employee, including Plaintiff, ever made a complaint about the failure to pay overtime and Mr. Magadish was not personally involved in determining the days or hours that Plaintiff worked.  Therefore, Plaintiff is not entitled to liquidated damages for his FLSA claim.[5]

### 2.    Violation of California Labor Code § 226.7 (Missed Meal Periods)

California Labor Code § 226.7 requires that: "No employer shall require any employee to work during any meal or rest period mandated by an applicable order of the Industrial Welfare Commission," and that "[i]f an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the Industrial Welfare Commission, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided.  Wage Order 7-2001, which governs the mercantile industry and is the applicable wage order here (see Order Following Pre-Trial Conference), states that, "[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of less than 30 minutes . . ."  Wage Order 7-2001 at 11(A).  "Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked."  Id. at 11(C).  Further, "[w]hen an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control" and must be paid.  Bono Enterprises, Inc. v. Bradshaw, 32 Cal.App.4th 968, 975 (1995) (disapproved of on other grounds by

---

[5]  Because Defendants have met their burden of showing good faith, the Court need not reach the issue of whether Plaintiff's admitted presentation of false documents to his employer bars the liquidated damages claim.

United States District Court
For the Northern District of California

1   Tidewater Marine Western, Inc. v. Bradshaw, 14 Cal 14th 557 (1996)).  Payment for missed meal

2   periods constitutes a wage and is subject to a three year statute of limitations.  Murphy v. Kenneth

3   Cole Productions, Inc., 40 Cal.4th 1094, 1110-1111 (2007).  An employer is required to keep

4   records showing the meal period taken by employees.  8 C.C.R. § 11050.

5         No records were kept with respect to meal periods, but there is no dispute that Plaintiff

6   received a meal period every day.  The question is the duration and quality of the meal periods and

7   whether Plaintiff was free to leave.  While Roberto Hernandez testified that he believed that delivery

8   trucks came at times other that during the warehouse employees' meal period so the meal period was

9   not interrupted, he did not work at the warehouse and had no personal knowledge of when deliveries

10  were generally made.  Thus, the Court credits the testimony of Plaintiff and Mr. Mendoza, that the

11  lunch hour was interrupted approximately twice a week, over that of Mr. Roberto Hernandez. The

12  Court finds that  Plaintiff's meal period was interrupted approximately twice a week and was thus an

13  "on duty" meal period for which payment is required.

14        However, the Court does not finds that Plaintiff is entitled to payment for all meal periods, as

15  he contends, based on the fact that he remained on premises during his lunch hour.  While Plaintiff

16  may not have believed that he was free to leave the premises during his lunch hour, based on the

17  testimony of Mr. Magadish, Mr. Roberto Hernandez and Mr. Pedro Hernandez, it appears to the

18  Court that this was not Defendants' official policy and no one directed, commanded or restrained

19  Plaintiff from leaving.   Instead, Plaintiff's practice of eating on the premises during lunch was more

20  likely a result of the fact that the warehouse was in a relatively remote part of San Francisco,

21  Plaintiff had no mode of transportation, and lunch was generally brought in so there was no reason

22  to leave.  As such, Plaintiff is entitled to his regular rate of pay for two hours per week for every

23  week that he worked in the warehouse as compensation for missed meal periods.

24              **3.      Claim 5: Violation of California Labor Code § 201 (Waiting Time
                          Penalties)**

25

26        California law requires the prompt payment of all wages due.  "Wages" include pay for all

27  hours worked, including overtime pay.  See Cal. Labor Code § 200(a).  If an employer fails to pay

28  all wages due, California Labor Code § 203 requires payment of "waiting time penalties" to the

affected employees.  "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefore is commenced; but the wages shall not continue for more than 30 days . . . Cal. Labor Code § 203.

The language of § 203, by use of the term "shall" regarding the payment of this penalty, is mandatory if the violation is willful.  Pursuant to 8 Cal. Code. Reg. § 13520: "A willful failure to pay wages within the meaning of Labor Code Section 203 occurs when an employer intentionally fails to pay wages to an employee when those wages are due.  However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203.  A "'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee. The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist. Defenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute'" Id.

Throughout this litigation and at trial, Defendants presented defenses based in both law and fact which could have precluded recovery and demonstrated the existence of a good faith dispute. There is no evidence that Defendants willfully withheld payment from Plaintiff, and instead the Court was persuaded by Mr. Magadish's testimony that he endeavored to treat employees fairly and pay them adequately for their services, even at the expense of his business.  Moreover, Plaintiff did not bring his claims for unpaid overtime and other payments to Defendants' attention until well after his employment terminated.  Therefore, Plaintiff is not entitled to any waiting time penalties under California Labor Code § 201.

### 4.    Claim 6: Violation of California Labor Code § 226 (Inadequate Wage Statements)

The Court has previously granted Plaintiff's motion for summary adjudication of this claim on the basis that there was no triable issue of fact as to whether Defendants provided Plaintiff with proper wage statements, and awarded judgment of this claim to Plaintiff in the amount of $4000.00,

the statutory maximum.

**IV.     DAMAGES**

Damages are warranted as specified above.  As discussed with the parties during the pretrial conference and indicated in the Court's Order Following Pre-Trial Conference, the Court hereby requires the parties to provide the Court with additional briefing regarding the appropriate calculation of damages to be awarded in light of the Court's ruling on Defendants' Motion In Limine No. 3.  The parties are hereby Ordered to submit a joint brief of no more than ten pages setting forth their respective positions regarding the exact amount of damages to be awarded based on the Court's Findings of Fact and Conclusions of Law as set forth above by no later than Wednesday, March 9, 2011.

**IT IS SO ORDERED.**

Dated: February 23, 2011

_Elizabeth D. Laporte_
ELIZABETH D. LAPORTE
United States Magistrate Judge